# UNITED STATES DISTRICT COURT

# EASTERN DISTRICT OF NEW YORK

| | |
|---|---|
| TRAILER CRAFT INC., ON BEHALF OF ITSELF AND ALL OTHERS SIMILARLY SITUATED<br><br>Plaintiff,<br><br>v.<br><br>ESPAR INC., ESPAR PRODUCTS INC., WEBASTO PRODUCTS NORTH AMERICA, INC. AND WEBASTO THERMO & COMFORT NORTH AMERICA INC.<br><br>Defendants. | Case No.<br><br>**CLASS ACTION COMPLAINT FOR FEDERAL ANTITRUST VIOLATIONS**<br><br><br>**JURY TRIAL DEMANDED** |

## INTRODUCTION

1.      Plaintiff brings this action on behalf of itself individually and on behalf of a plaintiff class (the "Class") consisting of all persons and entities who purchased parking heaters and accessories in the United States directly from Espar Inc., Espar Products, Inc. (collectively "Espar"), Webasto Products North America, Inc. ("WPNA"), Webasto Thermo & Comfort North America, Inc. ("WTNA")(WPNA and WTNA collectively are "Webasto") or one or more other co-conspirators (collectively, "Defendants") that conspired with Espar and/or WTNA to fix prices of parking heaters between October 1, 2007, and at least December 31, 2012 (the "Class Period"). Defendants and their co-conspirators are the leading suppliers of parking heaters in the United States. During the Class Period, Defendant Espar's sales of parking heaters to U.S. customers alone totaled at least $62.4 million.

2.      During the Class Period, Defendants were engaged in the sale of parking heaters, which are devices that heat the interior compartment of a motor vehicle independent of the operation of the vehicle's engine. Parking heaters are used in a wide variety of commercial vehicles. Parking heaters sold by the Defendants included two primary types: air heaters, which work by heating interior or outside air drawn into the heater unit, and water or "coolant" heaters, which are integrated into the engine coolant circuit and heat the engine as well as the interior compartment. As used in this Complaint, the term "Parking Heaters" includes the heaters themselves, accessories sold for use with heaters, and packages containing heaters and selected accessories (parking heater "kits").

3.      Plaintiff alleges that during the Class Period, the Defendants and their co-conspirators explicitly discussed Parking Heater prices for commercial vehicles, agreed to set a floor price for parking heater kits for commercial vehicles sold to aftermarket customers, and agreed to coordinate the timing and amount of price increases for Parking Heaters for commercial vehicles sold to aftermarket customers[1]. Defendants engaged in this anticompetitive behavior through their directors, officers, and employees, including high-level personnel, who participated in a combination and conspiracy to suppress and eliminate competition by agreeing to fix, stabilize, and maintain prices of Parking Heaters for commercial vehicles sold to aftermarket customers in the United States and elsewhere in North America, from at least as early as October 1, 2007 through at least December 31, 2012.

4.      In furtherance of the conspiracy, Defendants, through their directors, officers, and employees, engaged in communications and discussions and attended meetings with

---

[1] "Aftermarket customers" are customers that purchased parking heaters for installation in a vehicle after that vehicle had been sold by the original vehicle manufacturer.

representatives of their co-conspirators. During these communications, discussions, and meetings, agreements were reached to fix, stabilize, and maintain prices on Parking Heaters to be sold to aftermarket customers in the United States and elsewhere in North America. During the Class Period, Parking Heaters sold by one or more of the conspirator firms, and equipment and supplies necessary to produce and distribute parking heaters, as well as payments for parking heaters, traveled in interstate and foreign commerce. The business activities of the Defendants and their co-conspirators in connection with the production and sale of Parking Heaters that were the subject of this conspiracy were within the flow of, and substantially affected, interstate and foreign trade and commerce.

5.      The alleged conspiracy was furthered and facilitated by a course of anticompetitive conduct, including agreements and understandings among Defendants to increase and maintain prices.  The alleged conspiracy was also facilitated by the cartelized nature of the industry, by secret discussions and agreements among Defendants, and by the exchange of nonpublic, commercially sensitive information between and among Defendants and their agents and co-conspirators.  Plaintiff further alleges that Defendants fraudulently concealed their anticompetitive conduct from Plaintiff and members of the proposed Class in furtherance of the conspiracy until early February 2015.

6.      On March 12, 2015, the United States Department of Justice (the "DOJ") announced that Defendant Espar pleaded guilty to a felony criminal count of participating in a Parking Heater price fixing scheme ("Plea Agreement").  According to the charge, Espar conspired to fix prices for Parking Heaters in the United States and elsewhere in North America from at least as early as October 1, 2007 until at least December 31, 2012

in violation of the Sherman Antitrust Act, 15 U.S.C. § 1.  In addition to agreeing to pay a criminal fine of $14,970,000.00, Espar agreed to cooperate in the DOJ's ongoing investigation. Espar is scheduled to be sentenced on June 5, 2015.  See the Plea Agreement, ECF No. 16, filed in *United States v. Espar, Inc.,* No. 1:15-cr-00028 (March 12, 2015, E.D.N.Y.)(Exhibit A attached to this Complaint).

7.     As a result of Defendants' unlawful conduct, Parking Heater prices in the United States were artifically increased during the Class Period and Plaintiff and other members of the Class paid artificially inflated prices for Parking Heaters. Such prices exceeded the price they would have paid had the price for Parking Heaters been determined in a competitive market. Thus, Plaintiff and other members of the Class have been injured and have suffered damages.

## JURISDICTION AND VENUE

8.     Plaintiff brings this action to obtain injunctive relief and to recover damages, including treble damages, costs of suit, and reasonable attorney's fees arising from Defendants' violations of Section 1 of the Sherman Act (15 U.S.C. § 1).

9.     This Court has jurisdiction over this action pursuant to 28 U.S.C. §§ 1331, 1337(a) and Sections 4 and 16 of the Clayton Act (15 U.S.C. §§ 15(a) and 26).

10.     Venue is proper in this judicial district pursuant to 15 U.S.C. §§ 15 and 22, and 28 U.S.C. § 1391(b) and (c), because at least one of the Defendants resides in this judicial district; is licensed to do business, or is doing business in this judicial district; the Plea Agreement is being heard in this District, and because a substantial portion of the affected interstate trade and commerce described below has been carried out in this judicial district.

## PARTIES

11.     Plaintiff Trailer Craft Inc. is located in Anchorage Alaska and purchased Parking Heaters directly from Defendant Espar during the Class Period, at a price artificially inflated by the anticompetitive conduct of Defendant Espar and its co-conspirators, and was injured thereby.

12.     Eberspaecher Climate Control Systems International Beteiligungs-GmbH is a privately held company located in Esslingen, Germany. It is the parent company of both Espar Inc. and Espar Products Inc. It agreed to act as a guarantor to the United States for payment of the criminal fine of $14,970,000.00 imposed on Espar Inc., pursuant to the Plea Agreement. Eberspaecher Climate Control Systems International Beteiligungs-GmbH is not a named defendant.

13.     Defendant Espar Inc. is a corporation organized and existing under the laws of Illinois. Espar Inc. is headquartered in Novi, Michigan. Espar Inc. has agreed to plead guilty to one criminal count of price fixing Parking Heaters in violation of the Sherman Act.

14.     Defendant Espar Products Inc. is located in Mississauga, Ontario, Canada and is the North American Subsidiary of Eberspaecher Climate Control Systems International Beteiligungs-GmbH. The Plea Agreement refers to Espar Products Inc. as an "affiliate" of Espar Inc.

15.     Webasto SE is a privately held holding company headquartered in Stockdorf, Germany. Webasto SE was founded in Esslingen, Germany, where Eberspaecher Climate Control Systems International is still headquartered.  It is the parent company of

Defendant Webasto Products North America Inc.  Webasto SE is not a defendant in this action.

16.     Defendant Webasto Products North America, Inc. ("WPNA") is a privately held corporation incorporated in the State of Michigan. It is headquartered and has its principal place of business in Fenton, Michigan. It is the parent corporation of its wholly owned subsidiary, Defendant Webasto Thermo & Comfort North America Inc. ("WTNA")(WTNA and WPNA are collectively referred to as "Webasto").

17.     Defendant Webasto Thermo & Comfort North America Inc. is headquartered in Fenton, Michigan.  WTNA has an aftermarket sales office in Santa Fe Springs, California.  Dr. Rolf Haag is the President and Chief Executive Officer of WTNA which, according to its website, is the "North American leader in aftermarket automotive sunroofs and engine-off heating and cooling systems for the commercial vehicle, military, off-highway and marine markets." (emphasis added).  WTNA is a wholly owned subsidiary of WPNA. WTNA's sales are an estimated $18.8 million per year.

18.     Defendants and their co-conspirators, directly and through some of their affiliate corporations, sold Parking Heaters in the United States at artificially inflated prices during the Class Period.

## AGENTS AND CO-CONSPIRATORS

19.     Various entities not named as Defendants herein have participated in the violations alleged herein and have performed acts and made statements in furtherance thereof.  Plaintiff reserves the right to name some or all of these entities as defendants at a later date.

20.     The acts alleged herein that were done by each of the co-conspirators were fully authorized by each of those co-conspirators, or ordered, or done by duly authorized officers, agents, employees, or representatives or each co-conspirator while actively engaged in the management, direction, or control of its affairs.

21.     Defendants are also liable for any acts done in furtherance of the alleged conspiracy by companies they acquired through mergers and acquisitions or with which Defendants were otherwise affiliated.

## CLASS ACTION ALLEGATIONS

22.     Plaintiff brings this action both on behalf of itself and as a class action pursuant to Federal Rules of Civil Procedure, Rule 23(a), (b)(2) and (b)(3), on behalf of the following class (the "Class"):

> All persons and entities who purchased aftermarket Parking Heaters, including accessories sold in kits along with those Parking Heaters, in the United States directly from one or more Defendants or co-conspirators, or from and predecessors, parents, subsidiaries, or affiliates thereof, between October 1, 2007 and December 31, 2012. Excluded from the Class are Defendants, their co-conspirators, parent companies, predecessors, subsidiaries and affiliates and all governmental entities.

23.     Plaintiff does not know the exact number of class members, because such information is in the exclusive control of Defendants and their co-conspirators. Plaintiff is informed and believes that, due to the nature of the trade and commerce involved, there are thousands of class members geographically dispersed throughout the United States and elsewhere, such that joinder of all class members is impracticable.

24.     Plaintiff's claims are typical of the claims of the Class in that Plaintiff is a direct purchaser of Parking Heaters from Espar, Plaintiff and all Class Members were damaged

by the same wrongful conduct by Defendants and their co-conspirators as alleged herein, and the relief sought is common to the Class.

25.     Numerous questions of law or fact arise from Defendants' and their co-conspirators' anticompetitive conduct that are common to the Class, including, but not limited to:

a.   Whether Defendants and their co-conspirators combined or conspired to fix, raise, maintain, or stabilize prices of Parking Heaters sold in the United States;

b.   Whether Defendants and their co-conspirators shared nonpublic information, allocated markets and customers, restricted output of Parking Heaters sold in the United States, and/or committed other conduct in furtherance of the alleged conspiracy;

c.   Whether Defendants and their co-conspirators caused the prices of Parking Heaters sold in the United States to be at artificially high and non-competitive levels;

d.   Whether Plaintiff and other Class Members were injured by Defendants' and their co-conspirators' conduct and, if so, the appropriate class-wide measure of damages for Class Members; and

e.   Whether Plaintiff and other Class Members are entitled to, among other remedies, injunctive relief, and, if so, the nature and extent of such injunctive relief.

26.     These and other questions of law and fact are common to the Class and predominate over any questions affecting only individual Class members.

27.     Plaintiff will fairly and adequately represent the interests of the Class in that Plaintiff is a direct purchaser of Parking Heaters and has no conflicts with any other

members of the Class. Furthermore, Plaintiff has retained competent counsel that is experienced in antitrust, class action, and other complex litigations.

28.    Defendants Espar and Webasto and their co-conspirators and affiliates have acted on grounds generally applicable to the Class, thereby making final injunctive relief appropriate with respect to the Class as a whole.

29.    This class action is superior to the alternatives, if any, for the fair and efficient adjudication of this controversy.  Prosecution as a class action will eliminate the possibility of repetitive litigation. There will be no material difficulties in the management of this action as a class action.

30.    The prosecution of separate actions by individual Class members would create the risk of inconsistent or varying adjudications, establishing incompatible standards of conduct for Defendants and their co-conspirators.

## TRADE AND COMMERCE

31.    During the Class Period, each Defendant and certain co-conspirators, directly or through its subsidiaries, sold Parking Heaters in the United States in a continuous and uninterrupted flow of interstate commerce and foreign commerce including through and into this judicial district.

32.    During the Class Period, Defendants and their co-conspirators collectively controlled the market for Parking Heaters in the United States and North America.

33.    Defendants' business activities substantially affected interstate trade and commerce in the United States and caused antitrust injury in the United States.

## FACTUAL ALLEGATIONS

**Parking Heaters**

34.     Parking Heaters heat the interior of a vehicle without the engine being on and are used in a wide variety of commercial vehicles. They are marketed as a way to save the user money and being environmentally friendly, by eliminating the need to keep the vehicle running to heat the cabin. Parking Heaters sold by the Defendants and co-conspirators include two primary types: (1) air heaters, which work by heating interior or outside air drawn into the heater unit; and (2) water or liquid coolant heaters, which are integrated into the engine coolant circuit and heat the engine as well as the interior compartment.

35.     Defendants Webasto and Espar dominate the market for Parking Heaters in the United States. Webasto claims to be the North American leader in "engine-off" heaters for commercial vehicles, and Espar's sales of Parking Heaters to the United States aftermarket totaled at least $62.4 million during the Class Period.

36.     Parking Heaters typically are connected to the vehicle's fuel source to be powered and use far less fuel than does idling the vehicle to heat the interior.

37.     Water or coolant heaters, like Espar's "Hydronic" series or Webasto's "Thermo Pro" and "DBW" series, work independently of the engine to heat a vehicle's passenger compartment and preheat the engine. Such heaters are integrated into the cooling system of the engine. The thermal energy gained is circulated through the vehicle's own heat exchanger as forced hot air and this heats the interior of the vehicle via existing air vents. The engine is warmed up with the residual heat in the cooling water.

38.     Espar claims on its website that its "Hydronic" coolant heaters work independently of the engine and thus offer a "double plus: preheating the vehicle's passenger compartment and the engine." Espar notes that the heaters are integrated into the cooling system of the engine such that the heat provided is then distributed though the vehicle's own heat exchanger as forced hot air that comes out of the car's existing vents.

39.     Webasto claims on its website that its "Thermo Pro" heaters "warm engines to fuel saving operating temperatures, even before the vehicle is started." It further claims its "Thermo Pro" heaters help "establish and maintain comfortable temperatures in the interior during rest stops and when the vehicle is off."

40.     Air heaters, like Espar's "Airtronic" series, or Webasto's "Air Top" series, are independent of both the engine and the vehicle's own heating and coolant system. They draw in cool room or outside air, heat this air up and then deliver it to the interior of the vehicle. Such heaters can be installed in the cab, luggage department or under the floors of commercial vehicles.

41.     Webasto, on its website, touts its "Air Top" air heaters as "an ideal solution for interior cab or cargo area heat. Its compact design makes installation in the interior or the outside of the vehicle quick and easy." Webasto claims its air heaters operate quickly and quietly to reach and maintain the desired temperature. Webasto air heaters can be switched from recirculating the air to drawing in fresh air. Webasto states that they use as little as one gallon of fuel in a 22 hour period, provide high heat output in a compact design, provide a fast return on investment and operate quietly for a restful night's sleep.

42.     Espar claims on its website that its "Airtonic" air heaters operate independently of the engine and of the vehicle's own heat system and can draw in either interior air to heat

11

and recirculate or draw in  fresh outside air, heat this air up and then deliver it to the interior of the vehicle.

43.     Parking Heaters range in price from around $600 up to $1800, depending on their size and features, which can include remote controls, remote starters and other conveniences.

44.     The conspiracy alleged herein only involves aftermarket fuel-operated Parking Heaters used in commercial vehicles, as described in the Plea Agreement. Both air and water/coolant Parking Heaters were subject to price fixing by the Defendants, along with the accessories sold with each in aftermarket kits.

**Conspiracy to Fix Prices**

45.     On March 12, 2015 Espar pleaded guilty to a criminal count of violating Section 1 of the Sherman Act. The Plea Agreement Espar entered into with the DOJ was approved by Espar's Board of Directors, was signed by Espar's legal counsel and was entered in this District. It states that during the Class Period, Espar:

> through its directors, officers, and employees, including high level
> personnel of the defendant [Espar], participated in a combination and
> conspiracy to suppress and eliminate competition by agreeing to fix,
> stabilize, and maintain prices to parking heaters for commercial vehicles
> sold to aftermarket customers in the United States and elsewhere in North
> America, from at least as early as October 1, 2007 through at least
> December 31, 2012.  In furtherance of the conspiracy, the defendant
> [Espar], through its directors, officers, and employees, engaged in
> communications and discussions and attended meetings with
> representatives of its co-conspirators.  During these communications,
> discussions, and meetings, agreements were reached to fix, stabilize, and
> maintain prices on parking heaters to be sold to aftermarket customers in
> the United States and elsewhere in North America.

46.     The Plea Agreement explicitly makes clear that elements of the offense to which Espar pleaded guilty include: "(a) the conspiracy described in the Information existed at

or about the time alleged; (b) the defendant [Espar] knowingly became a member of the conspiracy; and (c) the conspiracy described in the Information either substantially affected interstate commerce in goods or services or occurred within the flow of interstate commerce in goods and services."

47.    The DOJ's press release (Exhibit B) announcing Espar's guilty plea, agreement to pay a significant criminal fine, and cooperation with its ongoing investigation, stated that:

> According to the charge, Espar and its co-conspirators discussed parking heater prices for commercial vehicles, agreed to set a price floor for parking heater kits for commercial vehicles sold to aftermarket customers, and agreed to coordinate the timing and amount of price increases for parking heaters for commercial vehicles sold to aftermarket customers. The companies carried out the agreement and exchanged information for the purpose of monitoring and enforcing adherence to the agreement.

48.    The Plea Agreement definitively establishes the existence of a price fixing conspiracy between Espar and at least one of its only two apparent competitors. Given the nature of the Parking Heater industry in the United States, where Webasto is the clear industry leader in the U.S. and North America, and given that Espar and Webasto are both German companies that were established in the same German town, it can reasonably be inferred that Webasto is the unnamed co-conspirator referred to in the Plea Agreement.

**Parking Heaters Industry is Conducive to Collusion**

49.    Parking Heaters are sold by manufacturers through distributors, dealers, and directly to original equipment manufacturers as well as owners of commercial vehicle fleets.  Espar engages in contracts with "Master Sales and Service Dealers," each of which has an assigned geographic territory in which it sells, installs and repairs Espar's heaters. Espar's network includes over 250 dealers that sell, install and repair its Parking

Heaters throughout the United States. Such Master Sales and Service Dealers receive "advantageous pricing on heater kits and repair parts, direct warranty filing and strong field support directly with your Eberspaecher regional managers and product support team."[2]

50.    Only three companies meaningfully participate in the Parking Heater market in the United States: Espar, Webasto and Marine Canada Acquisition Inc., which makes "Proheat" branded Parking Heaters. Proheat Parking Heaters constitute only a small portion of the United States market for aftermarket Parking Heaters. The Unites States market is dominated by Espar and Webasto.

51.    Marine Canada Acquisition Inc. is based in British Columbia, Canada, and manufactures air auxiliary heaters for heavy duty vehicles, including the Proheat Air Parking Heater, along with the Proheat X45 coolant Parking Heater, which is available in two sizes. Marine Canada has a significantly smaller share of the U.S. market for Parking Heaters than either Espar or Webasto.

52.    Webasto boasts on its website that it is the "North American leader in aftermarket automotive sunroofs and engine-off heating and cooling systems for the commercial vehicle, military, off-highway and marine markets."

53.    Webasto has the largest share of the United States Parking Heater market, and Websato SE, Webasto's German corporate parent, alone accounts for 75% of the global Parking Heater market. Espar and Webasto together have significant market power within and dominance over the Parking Heater market in the United States. Because Webasto

---

[2] *See* http://www.eberspaecher-na.com/business-units/fuel-operated-heaters/special-programs/thermo-king-dealers.html

and Espar are both closely held, private companies, Defendants are in possession of the specific information regarding their collective market power and dominance.

54.     All Parking Heaters serve the same purpose for consumers as other Parking Heaters – heating the interior of a vehicle without the need to idle the vehicle's engine, while using the vehicle's fuel source. Parking Heaters produced by the dominant manufacturers also have comparable specifications, such as fuel consumption rates, heat output, electrical consumption and weight. Parking Heater purchasers are therefore likely to be influenced by price when making a Parking Heater purchase decision.

55.     The heaters made by Espar and Webasto are so fungible that trucking company Schneider Trucking has a note on its Facebook Page titled "Want more form your Espar or Webasto heater?" in which it gives tips that apply universally to either Espar or Webasto  Parking Heaters.[3]

56.     Espar and Webasto manufacture the two leading fuel-operated Parking Heaters on the market: Espar's Airtonic D2 and Webasto's Air Top 2000; both expend only one gallon of fuel for over 20 hours of operation, include a built in thermostat and operate in a similar manner with a similar design.

57.     Fuel-operated Parking Heaters are unique products without meaningful substitutes. Alternative technologies cost three to eight times as much as Parking Heaters and are far more complex to install, or have limited heating capability due to battery power.

58.     High barriers to entry exist in the Parking Heater industry due to the technical design and manufacturing process, as well as limited access to distribution channels.

---

[3] https://www.facebook.com/notes/schneider-national-inc/want-more-from-your-espar-or-webasto-heater/10151801038776283

Espar's "Master Sales and Service Dealers," for instance, are forbidden from distributing competitors' Parking Heaters within their territories. Thus, there are only three meaningful participants in the United States market for aftermarket Parking Heaters.[4]

59.     The trucking industry provides ample opportunities to Defendants for collusion, collaboration and opportunities to fix and stabilize prices. For instance, Espar and Webasto both attended the National Truck Equipment Association's World Truck Trade Show, held March 4-7, 2014 in Indianapolis, Indiana.

60.     Espar and Webasto further attended the American Trucking Association's Technology & Maintenance Counsel's Annual Meeting & Transportation Technology Exhibition held March 10-13, 2014 in Nashville, Tennessee.

61.     Espar and Webasto are listed as "past exhibitors" at the American Trucking Association's Management Conference & Exhibition in promotional materials for the 2015 meeting.

62.     Espar and Webasto are listed as exhibitors at the 2015 Transporting Students with Disabilities and Preschoolers Conference and Trade Show, which occurred March 23, 2015 in Frisco, Texas.

63.     Espar and Webasto are listed as 2013 exhibitors at the School Transportation Association of Indiana annual conference.

64.     Espar and Webasto also attended Truck-World-Canada's National Truck Show held April 10-12, 2014 in Toronto, Canada.

65.     Espar and Webasto attended the Mid-America Trucking Show, on March 26-28, 2015 in Louisville, Kentucky.

---

[4] http://www.eberspaecher-na.com/fileadmin/data/countrysites/EB_Kanada/pdf/QSF-146_Rev_2_Espar_MSD_Contract_2010_2011.pdf

66.     There have been many other trade shows attended by two or more Defendants and/or co-conspirators throughout the Class Period that provided many opportunities to conspire. Espar's Plea Agreement definitively establishes that meetings and/or communications to set prices occurred.

67.     The commodity-like nature of Parking Heaters, the high-barriers to entry into the market, and the extreme concentration of the U.S. market in just three main competitors made the Parking Heaters market susceptible to illegal anticompetitive collusion to which Espar has pled guilty.

## FRAUDULENT CONCEALMENT
## AND THE TOLLING OF THE STATUTE OF LIMITATIONS

68.     Plaintiff did not and could not have discovered through the exercise of reasonable diligence that it was the victim of the alleged conspiracy to fix Parking Heater prices until at the earliest, early February 2015, when it received a letter from the DOJ stating that it "is a potential victim of the crime being charged" against Espar, to which Espar has since pled guilty.

69.     Before receiving such notice of the price fixing conspiracy from the DOJ, Plaintiff was not in possession of facts plausibly suggesting that it was being charged artificially inflated prices due to a price fixing conspiracy for the Parking Heaters it purchased from Espar.

70.     By its very nature, Defendants' and their co-conspirators' alleged price-fixing conspiracy was inherently self-concealing. Plaintiff thus had neither actual nor constructive knowledge of the facts constituting its claims for relief despite diligence in trying to discover pertinent facts. Plaintiff and members of the proposed Class did not discover, and could not have discovered through the exercise of reasonable diligence that

Defendants and their co-conspirators were violating the antitrust laws until notified by the DOJ in February 2015. Nor could Plaintiff or members of the proposed Class have discovered the alleged violations earlier than that time, because Defendants and their co-conspirators are alleged to have affirmatively concealed their conspiracy by meeting secretly to discuss Parking Heater prices, customers and markets; by agreeing among themselves at meeting and in communications not to discuss publicly, or otherwise reveal, the nature and substance of the acts and communications in furtherance of their illegal scheme; by giving false and pretextual reasons for price increases, and by describing Parking Heater pricing falsely as being the result of competition rather than collusion; and by wrongfully and fraudulently concealing their collusive activities through various other means and methods designed to avoid detection.

71.     For instance, Espar made affirmative representations during the Class Period that it priced competitively, stating in 2010, for example, that "Espar provides uncompromised quality at competitive pricing."[5]

72.     Without the benefit of discovery, it is impossible to determine the scope and extent of Defendants' and their co-conspirators' (non-public) meetings and communications with each other. Defendants are alleged to have engaged in a secret conspiracy that necessarily did not give rise to facts that would put Plaintiff or the proposed Class on inquiry notice that there was a conspiracy to fix prices of Parking Heaters. As explained above, it was not until the DOJ notified Plaintiff it was a potential victim of Espar's participation in the price fixing conspiracy that an investigation began of the Parking Heater industry and led to the filing of this Complaint.

---

[5] http://www.granitestatecleancities.nh.gov/calendar/2011/documents/espar_heaters.pdf

73.     Because Defendants' agreement, understanding and conspiracy was kept secret, Plaintiff and members of the proposed Class were unaware of Defendants' unlawful conduct alleged herein and did not know they were paying artificially high prices for Parking Heaters.

74.     The affirmative acts of Defendants alleged herein, including acts in furtherance of the conspiracy, were wrongfully concealed and carried out in a manner that precluded detection.

75.     Defendants' fraudulent concealment tolls any applicable statute of limitations affecting or limiting the rights of action by the Plaintiff or members of the Class for the time such fraudulent concealment was taking pace.

## CLAIM FOR RELIEF

### FOR VIOLATION OF
### SECTION 1 OF THE SHERMAN ACT (15 U.S.C. § 1)

76.     Plaintiff incorporates by reference all of the previous allegations in, and exhibits attached to, this Complaint.

77.     During the Class Period, Defendants Espar and Webasto and their co-conspirators entered into a continuing contract, combination, or conspiracy to unreasonably restrain trade and commerce in violation of Section 1 of the Sherman Act and Section 4 of the Clayton Act. Specifically, Espar has pleaded guilty to a criminal count of violating Section 1 of the Sherman Act, and in doing so has admitted that it participated in a price fixing conspiracy to fix, increase, stabilize and/or maintain the price of Parking Heaters with at least one other co-conspirator, which, upon information and belief, Plaintiff alleges was Webasto.

78.     This alleged price fixing conspiracy restrained price competition in the Parking Heaters market in the United States, causing prices of Parking Heaters paid by Plaintiff and members of the proposed Class during the Class Period to be artificially high. Plaintiff and members of the proposed Class have been deprived of the benefits of competition in the market for Parking Heaters and were damaged thereby, having paid more for the Parking Heaters they purchased than they otherwise would have paid in the absence of the illegal price fixing conspiracy between Espar, Webasto and any other as-of-yet unidentified co-conspirators.

79.     Defendants and their co-conspirators engaged in the following conduct to effectuate their combination or conspiracy:

    a.  Participated in meetings and conversations to discuss the prices and supply of Parking Heaters;

    b.  Communicating in orally and in writing to fix prices;

    c.  Agreeing to manipulate fix, and/or stabilize the price of Parking Heaters sold in the United States in a manner that deprived Plaintiff and members of the proposed Class the benefits of free and open competition;

    d.  Agreeing to set a price floor for Parking Heaters sold to aftermarket customers;

    e.  Agreeing to coordinate the timing and amount of price increases of Parking Heaters sold to aftermarket customers;

    f.  Regularly exchanging competitively sensitive information for the purpose of monitoring and enforcing adherence to the contract, agreement, combination or conspiracy;

g.   Selling Parking Heaters to aftermarket customers in the United States at artificially inflated, non-competitive prices; and

h.   Providing false and/or misleading statements to the public to explain the prices of and/or price increases for Parking Heaters.

80.   As a result of the Defendants' and their co-conspirators' unlawful conduct, Plaintiff and the other members of the proposed Class have been injured in their business and property in that they have paid more for Parking Heaters than they otherwise would have paid in the absence of Defendants' unlawful conduct.

### DAMAGES

81.   During the Class Period, Plaintiff and other members of the proposed Class purchased Parking Heaters directly from Defendants or their co-conspirators, or their subsidiaries, agents, and/or affiliates and, by reason of the antitrust violations herein alleged, paid more for those Parking Heaters than they otherwise would have paid in the absence of such antitrust violations. As a result, Plaintiff and the other members of the proposed Class have sustained damages to their business and property in an amount to be determined at trial.

### REQUEST FOR RELIEF

WHEREFORE, Plaintiff requests that the Court enter judgment on its behalf and on behalf of the proposed Class herein, adjudging and decreeing that:

A.   This action may be maintained as a class action under Rule 23(b)(3) of the Federal Rules of Civil Procedure, that Plaintiff be appointed as class representative, and that Plaintiff's counsel be appointed as counsel for the Class;

B.   That the unlawful conduct alleged herein be adjudged and decreed to be an

unlawful restraint of trade in violation of Section 1 of the Sherman Act and      Section 4 of the Clayton Act;

C.      That Defendants, their subsidiaries, affiliates, successors, transferees, assignees and the respective officers, directors, partners, agents and employees, as well as all other persons acting or claiming to act on its behalf, be permanently enjoined and restrained from continuing and maintaining the conspiracy alleged in the Complaint;

D.      That Plaintiff and the Class recover damages, as provided under federal antitrust laws, and that a joint and several judgment in favor of Plaintiff and the Class be entered against Defendants in an amount to be trebled in accordance with such laws;

E.      That Plaintiff and the Class recover their costs of the suit, including attorneys' fees, as provided by law; and

F.      That the Court direct such further relief it may deem just and proper.

## DEMAND FOR JURY TRIAL

Pursuant to Rule 38(a) of the Federal Rules of Civil Procedure, Plaintiff Trailer Craft Inc. demands a jury trial as to all issues triable by a jury.

Dated: April 27, 2015

KLAFTER OLSEN & LESSER LLP

By: /s/Jeffrey A. Klafter
Jeffrey A. Klafter
Two International Drive, Suite 350
Rye Brook, NY 10573
Tel: (914) 934-9200
jak@klafterolsen.com

– and –

CERA LLP
Solomon B. Cera
Louis A. Kessler
595 Market Street, Suite 2300
San Francisco, CA 94105
Telephone: (415) 777-2230
scera@cerallp.com
lakessler@cerallp.com

Attorneys for Plaintiff